## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

RIVERKEEPER, INC.,
          PLAINTIFF,

v.

BEST CONCRETE MIX CORP.; MICHAEL
EMANUELE,
          DEFENDANTS.

---------------------------------------------------------------

Case No. 1:20-cv-5079

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control
Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiff Riverkeeper, Inc. by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1.     This action is brought under the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"), to address and abate Defendants' ongoing and continuous violations of the Act.

2.     Defendants discharge polluted industrial stormwater from a ready-mix concrete facility located at 35-10 College Point Boulevard, Flushing, NY 11354  (the "Facility") into Flushing Creek in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf ("General Permit").

3.     Defendants' violations of the General Permit and the Clean Water Act include: discharging pollutants to Flushing Creek without a permit for approximately 22 months; discharging pollution that is not authorized by the General Permit (or any other permit); inadequate pollution control measures and pollution prevention plans; and contributing to violations of water quality standards for Flushing Creek.

4.     Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted stormwater pour into Flushing Creek and other receiving waters in this District.  The State of New York has designated as "impaired" more than 7,000 river miles; 319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of coastal shoreline; and 592 miles of Great Lakes shoreline.  Under the Clean Water Act, "impaired" means not meeting a state's water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

5.     Flushing Creek is one of these impaired waterbodies.  New York State has determined that Flushing Creek and the adjacent Flushing Bay do not meet state water quality standards for dissolved oxygen and pathogens. Dissolved oxygen is essential to all aquatic life – without it, aquatic organisms die and ecosystems collapse.

6.     Defendants' stormwater discharges contribute to this endemic stormwater

pollution problem.  Defendants engage in industrial activities such as manufacturing, loading, and delivering ready-mix concrete.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby waters. Contaminated stormwater discharges such as those from the Facility can and must be controlled to the fullest extent required by law in order to allow these water bodies a fighting chance to regain their health.

## II.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

8.     On July 2, 2020, Plaintiff provided notice of Defendants' violations of the Act and of its intention to file suit against Defendants to Defendants; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of the New York Department of Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and correct copy of Plaintiff's notice letter is attached as Exhibit A and is incorporated by reference.

9.      More than sixty days have passed since the notice letter was served on Defendants and the State and federal agencies.  Plaintiff has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

10.     Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

11.     This action is not barred by any prior administrative penalty action under CWA Section 309(g), 33 U.S.C. § 1319(g).

12.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations is located within this judicial district.

### III.

### PARTIES

13.     Plaintiff Riverkeeper, Inc. ("Riverkeeper") is a non-profit corporation, whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hudson River through enforcement, field work, and community action.  Riverkeeper has approximately 3,100 members in the New York and New Jersey region, many of whom use and enjoy the Hudson River and the waters and tributaries of the Hudson River and New York Harbor, including Flushing Bay, and Flushing Creek, waters that are polluted by industrial stormwater runoff from the Facility.

14.     Plaintiff's members reside near to, use and enjoy the waters that Defendants are polluting.  Plaintiff's members use those areas to sail, boat, canoe, kayak, birdwatch, photograph, observe wildlife and engage in nature study and scientific study, among other activities.

Defendants' discharges of stormwater associated with industrial activity containing pollutants impair each of those uses.  Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the General Permit.  The relief sought herein will redress the harms to Riverkeeper caused by Defendants' activities.

15.     The relief sought herein will redress the harms to Plaintiff and its members caused by Defendants' activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

16.     Riverkeeper brings this action on behalf of itself and its members.  Riverkeeper's interest in reducing Defendants' discharges of pollutants into Flushing Creek and requiring Defendants to comply with the requirements of the General Permit are germane to Riverkeeper's purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Riverkeeper.

17.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Best Concrete Mix Corp. is a corporation incorporated under the laws of the State of New York, that owns and/or operates the Facility.

18.     Plaintiff is informed and believes, and thereupon alleges, that Defendant Michael Emanuele is the chief executive officer and an owner of Best Concrete Mix Corp.

**IV.**

**STATUTORY AND REGULATORY BACKGROUND**

**<u>The Clean Water Act</u>**

19.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the

chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C.
§ 1251(a). In furtherance of this goal, the Act provides a comprehensive approach for the
regulation of pollution discharged into the waters of the United States.

20. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any
pollutant into waters of the United States, unless such discharge is in compliance with various
enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not
authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System
("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. An NPDES
permit requires dischargers of pollution to comply with various limitations.

21. NPDES permits are issued by the United States Environmental Protection Agency
("EPA") or by states that have been authorized by EPA to act as NPDES permitting authorities,
provided that the state permitting program ensures compliance with the procedural and
substantive requirements of the CWA. CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R.
§ 123.25(a).

22. In New York, DEC has been delegated the authority to issue NPDES permits.
Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the
Clean Water Act, are referred to as "SPDES" permits.

**Stormwater Permits**

23. In 1987, to better regulate pollution conveyed by stormwater runoff, Congress
enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial
Stormwater Discharges."

24. Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated
stormwater discharge regulations at 40 C.F.R. § 122.26.

25.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

26.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

### New York's General Permit for the Discharge of Stormwater Associated with Industrial Activity

27.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  *SPDES Multi-Sector General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-17-004, N.Y. DEP'T ENVTL. CONSERVATION (Mar. 1, 2018) ("General Permit").  DEC also has the authority to issue SPDES permits for individual applicants.

28.     Under the General Permit, permittees must comply with federal technology-based standards.  The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).   In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. §

1311(b)(2)(A).   The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants".  Id. § 1311(b)(2)(E).[1]  *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

29.     Accordingly, as a state-issued, delegated NPDES permit, the General Permit requires permittees to use measures that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the best available technology economically achievable ("BAT") standards for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") standards for conventional pollutants.  *See* General Permit, Part II (requiring permittees to minimize pollution by adopting measures that are "technologically available and economically practicable and achievable in light of best industry practice.").

30.     The General Permit also ensures compliance with state water quality standards. The Clean Water Act requires that any NPDES permit issued by a state contain any further limits necessary to ensure compliance with a state's water quality standards. *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards") and 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311). *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

31.     Accordingly, as a state-issued, delegated NPDES permit, the General Permit

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

prohibits permittees from causing or contributing to violations of water quality standards. *See* General Permit, Part II.C.1.a ("It shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700-705."); II.C.1.c ("In all cases, any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited.").

## The General Permit Framework

32.     The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions. All of the General Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the Clean Water Act's citizen suit provision. *See* 33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title[.]").

33.     At the outset, the General Permit establishes eligibility conditions that Permittees must meet in order to obtain coverage. General Permit, Part I. Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent for coverage ("NOI"). General Permit, Part I.D.

34.     Among other things, when submitting a NOI, the applicant must identify the specific outfalls through which it will discharge industrial stormwater. A permittee may only lawfully discharge stormwater associated with industrial activity from these outfalls. General Permit, Parts I.D.3 and I.F.

35.     Next, the General Permit also contains a variety of substantive limits that all permittees must meet (*see* General Permit, Part II). These include numeric effluent limitations

on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and narrative effluent limitations that impose compulsory pollution control and minimization practices.  *See* General Permit, Part II.

36.     In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities. *See* General Permit, Part VII.  Although permittees may have a primary industrial activity occurring at their site, they are required to comply with all conditions of the General Permit pertaining to any other industrial activities occurring at their facility too, referred to as "co-located" activities.  *Id.*  ("Stormwater discharges from co-located industrial activities are authorized by this permit, provided that the owner or operator complies with any and all of the requirements applicable to each industrial activity at the facility.").

37.     Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting "best management practices" ("BMPs") and other stormwater control measures.  *See* General Permit Part II.  BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).  The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit.  General Permit, Part II, Part III.A.7.

38.     A permittee must record the BMPs and controls measures used to meet the General Permit's limits in a "stormwater pollution prevention plan" ("SWPPP").  General

Permit, Part III.  The owner or operator must develop, implement, and continually update the plan.  General Permit, Part III.  The SWPPP must address all of the permittee's industrial activities and meet all other requirements for such plans set forth in the General Permit.  *Id*. Further the SWPPP must be developed and fully implemented before an applicant is eligible to discharge industrial stormwater under the General Permit – a fully implemented SWPPP is a precondition of coverage.  General Permit, Part I.D.1.a.

39.     Permittees must also track, improve upon and report upon their performance under the General Permit.  The General Permit requires regular inspections, monitoring and sampling of stormwater discharges, periodic reporting, and corrective action to reduce pollution when necessary.  *See* General Permit Parts IV-VI.

40.     The General Permit also relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" (benchmarks) for each pollutant, in order to ensure that permittees are complying with the limits set forth in the General Permit.  *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

41.     A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." General Permit, Appendix A.  As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans."  60 Fed. Reg. 50804, 51076 (Sept. 29, 1995).  Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish."  60 Fed. Reg. at 50824–25.

42.     Thus, the benchmarks provide strong evidence of whether a facility has

implemented adequate control measures and BMPs to comply with the General Permit and the

federal technology and water-quality based standards that it implements.  Although compliance

with benchmarks under the General Permit is self-reported, self-monitoring reports under the

General Permit are deemed "conclusive evidence of an exceedance of a permit limitation."

*Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), vacated on other grounds, 485

U.S. 931 (1988).

<u>**Key Conditions of the General Permit**</u>

43.     Within that framework, the following specific conditions of the General Permit

are particularly relevant in this case.

44.     The General Permit only authorizes discharges from designated outfalls.  General

Permit, Part I.D.3.

45.     The General Permit requires Defendants to ensure that all vehicle and/or

equipment cleaning operations occur indoors, under cover, or in bermed areas and ensure that all

washwater drains to a proper collection system, not a stormwater drainage system.  General

Permit, Part II.A.1.f.

46.     The General Permit forbids the discharge of industrial stormwater that has been

mix with most types of wastewater, such as truck wash water or concrete washout wastes.

General Permit, Part I.C.1.

47.     In order to minimize pollution, the General Permit requires Defendants to keep

clean all exposed areas that are potential sources of pollutants.  General Permit, Part II.A.2.

48.     The General Permit requires Defendants to sweep or vacuum exposed areas at

regular intervals; store materials in containers; keep dumpsters lidded at all times; and prevent

the introduction of floatable debris in surface waters of the state by keeping exposed areas clear

of waste and intercepting waste.  General Permit, Part II.A.10.

49.     The General Permit requires Defendants to minimize off-site tracking of materials to prevent pollution.  General Permit, Part II.A.11.

50.      The General Permit prohibits any discharge that may cause or contribute to a violation of New York's water quality standards.  General Permit, Part II.C.1.c.

51.     Defendants' SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.  Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.  General Permit, Part III.A.

52.     Part VII of the General Permit also imposes other requirements on Defendants based on their specific industrial activities, including but not limited to ensuring that process wastewater that results from washing of trucks is discharged in accordance with a separate SPDES permit or is recycled.  General Permit, Part VII.E.

53.     Part IV of the General Permit obliges industrial dischargers to conduct an annual comprehensive site inspection of a facility that includes evaluation of areas where industrial materials or activities are exposed to precipitation or where spills and leaks have occurred within the past three years.  General Permit, Part IV.A.1.  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected. Records of this inspection must be kept for five years.  General Permit, Part IV.A.2.

54.     In addition, qualified facility personnel must carry out routine inspections at least quarterly.  General Permit, Part IV.B.  During these inspections, personnel must evaluate conditions and maintenance needs of stormwater management devices, detect leaks and ensure

the good condition of containers, evaluate the performance of the existing stormwater BMPs described in the SWPPP, and document any deficiencies in the implementation and/or adequacy of the SWPPP.  Such deficiencies must then be addressed through corrective actions.  General Permit, Part V.

55.     The General Permit requires industrial dischargers to monitor its facility, sample discharges, and submit complete and accurate reports to DEC.  General Permit, Parts IV, VI, Appendices H.8.g, H.9.  The required reporting includes an annual report and periodic discharge monitoring reports.  General Permit, Part VI.A.1 and A.2.

56.     The General Permit requires industrial dischargers to take corrective action to fix problems.  Corrective action is required when: there is evidence indicating that a permittee's stormwater discharges cause, have reasonable potential to cause or contribute to violations of water quality standards (General Permit, Part II.C.1.b); when a site inspection indicates the presence of stormwater pollution through visual indicators such as color or floating solids in a discharge (General Permit, Part IV.A.1.b); when a non-stormwater discharge is discovered (General Permit, Part IV.C.3); or when a benchmark exceedance is detected in a stormwater sample (General Permit, Part IV.F.3.c.1).  Corrective actions to address these problems must be documented in the Facility's SWPPP.  Part III.E.2.a.

## Beneficial Uses of New York Surface Waters

57.     The DEC has classified the portion of Flushing Creek where the Facility discharges as a Class I water.  6 N.Y.C.R.R. § 935.6.

58.     Under New York's water quality standards, a waterbody that is designated Class I is meant to be suitable for secondary contact recreation, fishing, and for fish, shellfish, and wildlife propagation and survival, as well as for potential use for primary contact recreation.  6

N.Y.C.R.R. § 701.13.

59.     New York's water quality standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and hundreds of others.  *See generally* 6 N.Y.C.R.R. §§ 702, 703 (outlining quantitative and qualitative standards, respectively).  A waterbody must meet these numeric and narrative criteria in order to support its designated uses.  *See id.* §§ 702.2, 702.9.

60.     DEC has designated Flushing Creek as impaired pursuant to CWA Section 303(d) for failure to meet minimum water quality standards for dissolved oxygen and pathogens. *Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy*, N.Y. DEP'T ENVTL. CONSERVATION, 33 (Nov. 2016).

## CWA Citizen Enforcement Suits

61.     Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

62.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

63.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

64.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

65.     Violators of the Act are also subject to an assessment of civil penalties of up to

$37,500 per day per violation for violations occurring before November 2, 2015 and up to

$55,800 per day per violation for violations occurring after that date.  CWA §§ 309(d), 505(a),

33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### The Facility and Stormwater

66.     Defendants owns and/operates the Facility, a ready-mix concrete facility located

in Flushing, NY.

67.     At the Facility, Defendants engage in concrete production, which involves storage

of raw materials, concrete mixing, loading trucks, truck washout, and vehicle and heavy

equipment maintenance.

68.     The Facility includes buildings and approximately a half-acre of uncovered

storage for raw materials, as well as various containers, vehicles, and heavy machinery that

likely undergoes maintenance on-site.

69.     Industrial activities at the Facility are categorized within Standard Industrial

Classification ("SIC") Code 3273 (ready-mixed concrete).  Activities in this SIC Code are

subject to the General Permit's effluent limits for industrial Sector E.

70.     The Facility is directly adjacent to Flushing Creek, approximately a half-mile

upstream of Flushing Bay.

71.     When it rains, the majority of stormwater from the Facility comes from, or is

commingled with runoff from, areas at the Facility where industrial processes occur.

72.     Stormwater flowing over areas of the Facility that are associated with Defendants'

industrial activities collects a variety of pollutants, including but not limited to sizeable debris,

sediment, oil and grease, metals, organic substances and chemicals that create chemical oxygen demand, and other pollutants.

73.     Stormwater discharged from the Facility flows directly into Flushing Creek as well as into municipal storm sewer drains that discharge into Flushing Creek.

### Defendants' General Permit Coverage

74.     Defendants have established a decade long pattern of violating the Clean Water Act and the General Permit.  The pattern includes: failing to maintain permit coverage; discharging pollution from unpermitted sources and activities; relying on inadequate pollution controls; violating the monitoring and reporting provisions of the General Permit, and failing to take corrective action to address pollution.

75.     Prior to 2012, Defendants discharged industrial stormwater without a permit.

76.     Defendants submitted their first NOI on June 29, 2012 after being ordered to by DEC in enforcement action number R2-20120611-349.  Defendants were issued General Permit identification number NYR00D702.  Coverage for the Facility was effective under the General Permit then in effect, GP-0-11-009.

77.     The General Permit expires every five years and DEC issues a new permit with updated provisions.  DEC requires permittees to reapply when a General Permit expires, but typically grants a grace period by declaring that all prior permittees are eligible under the newly issued General Permit for a period of 120 days.  To reapply for coverage under a new General Permit, permittees previously covered by the old permit must update their facility's SWPPP as may be necessary to comply with the new General Permit and then submit an updated NOI within 90 days.

78.     After the first permit that Defendants were covered under (GP-0-11-009) expired,

Defendants failed to submit an NOI for renewal under GP-0-12-001 until DEC sent a notice of failure to renew on March 7, 2013.

79.     On April 1, 2013, Defendants sent an NOI for coverage under GP-0-12-001.

80.     When GP-0-12-001 expired in 2017, Defendants again did not apply for coverage under the new permit during the 120 day grace period.

81.     By letter on February 23, 2018, DEC informed Defendants that their coverage under GP-0-12-001 had expired on September 30, 2017.  DEC gave Defendants another opportunity to apply for continued coverage until May 30, 2018.  Defendants again failed to submit an updated NOI.  DEC sent letters again on January 10, 2019 and July 1, 2019, with still no response from Defendants.

82.     On December 26, 2019, DEC acknowledged that Defendants had finally re-established permit coverage.  According to DEC, Defendants operated without permit coverage from March 1, 2018 to December 25, 2019, a period of about 22 months.

83.     On July 2, 2020, Riverkeeper informed Defendants of its intention to sue over Defendants' violations of the Clean Water Act and requested that Defendants provide a copy of their current SWPPP.

84.     On August 31, 2020, Defendants provided to Riverkeeper a copy of the current SWPPP for the Facility.

85.     On August 31, 2020, Defendants also provided Riverkeeper a copy of the Facility's most recent discharge monitoring report, reporting on a sample taken in July or August of 2020 to serve as Defendants' stormwater sample for the second half of 2020.

86.     Based on review of government data sources, Riverkeeper alleges that the sample collected in July or August 2020 was the first sample that Defendants collected and reported on

in 2019 or 2020.

**Defendants Discharge Process Wastewater Through a Pipe in the Facility's Bulkhead**

87.     Under the General Permit, Defendants are authorized to discharge only through the outfall that Defendants have identified in their NOI and in their quarterly and annual reports to DEC: the outfall listed by Defendants as outfall 001 in these documents, which discharges to a municipal storm drain.

88.     However, Defendants discharge pollutants from another, unpermitted outfall: a pipe located in Defendants' bulkhead (the "Pipe").

89.     Defendants have not designated the Pipe as an outfall in their NOI.

90.     Defendants do not have coverage under the General Permit for discharges from the Pipe.

91.     On information and belief, Riverkeeper alleges that Defendants have failed and are failing to monitor and report to the DEC discharges from the Pipe.

92.     On information and belief, Defendants are discharging water that is visibly discolored directly into Flushing Creek from the Pipe.

93.     During such discharges from the Pipe, there is a visible plume of contaminated water extending from the Facility into Flushing Creek.

94.     Discharge from the Pipe has been observed even on days with no precipitation or snowmelt.

95.     Riverkeeper alleges that the Pipe discharges process wastewaters, not stormwater.

96.     Discharges of non-stormwater are ineligible for coverage under the General Permit.  General Permit, Part. I.C.1.

97.     Defendants do not have a separate permit that authorizes the discharge of process

wastewater.

98.     Process wastewater may carry a significantly higher concentration of pollutants than simple stormwater.

**Defendants Discharge Pollution Into Storm Drains Near The Facility**

99.     Riverkeeper has observed Defendants washing their concrete trucks with hoses under the Northern Boulevard overpass.  The wash water from concrete trucks constitutes process wastewater.

100.     Upon information and belief, Riverkeeper alleges that this process wastewater is discharged to municipal storm drains that discharge directly to Flushing Creek, without treatment.

101.     Further, on information and belief, Riverkeeper alleges that track-out pollution (pollution carried on and falling off of vehicles and their tires) is found on College Point Boulevard and 35th Avenue near the entrance to the Facility.  Stormwater washes these pollutants into storm drains that discharge into Flushing Creek.

**Defendants' Pollution Prevention Practices Are Inadequate**

102.     Riverkeeper alleges that there are insufficient stormwater control measures and BMPs installed at the Facility.  Riverkeeper is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to minimize pollution in industrial stormwater discharged to waters of the United States.

103.     This lack of BMPs is evidenced by Defendants' discharges of process wastewater, washing of trucks in the street, heavy track-out of pollution near the entrance to the Facility, and, as described in more detail below, self-reported consistent benchmark exceedances and visual concerns at the Facility itself.

## Defendants' SWPPP Is Inadequate

104.     On information and belief, Riverkeeper alleges that Defendants have not implemented an adequate SWPPP for the Facility.  Riverkeeper is informed and believes, and thereupon alleges, that the SWPPP does not contain an accurate site description and map, including identifying all storm water flow paths and discharge locations to surface waters or drains, such as the locations of the unpermitted outfalls identified above.

105.     On information and belief, Riverkeeper alleges that the SWPPP prepared for the Facility does not set forth adequate site-specific BMPs, such as housekeeping measures, or adequate structural control measures, to be consistent with BAT or BCT for the Facility and to meet the General Permit's requirement to minimize pollutant discharges.  Among other deficiencies, Riverkeeper alleges that the SWPPP does not adequately prevent the discharge of process wastewater, does not control pollution from the Pipe, and does not adequately address pollution from Defendant's track-out or from Defendants' truck washing in the streets adjacent to the Facility.

## Defendants' Monitoring, Reporting, and Recordkeeping are Deficient

106.     Riverkeeper is informed and believes, and thereupon alleges, that Defendants have not conducted and are not conducting adequate annual comprehensive and quarterly routine site inspections of the Facility.

107.     The inadequacy of Defendants' inspections is evidenced by Defendants' non-stormwater discharges, including discharges from the Pipe, and by the heavy track-out in the streets near Defendants' facility.

108.     In recent years, DEC also issued multiple Notices of Violation to Defendants for not complying with the General Permit's recordkeeping and reporting requirements, including:

(a)  failing to report on corrective actions required in response to exceedances of pollution

benchmarks that occurred in 2015;

(b)  failing to submit annual reports in 2016, 2017, 2018; and

(c)  failing to submit discharge monitoring reports in 2016, 2017, and 2018;

109.    On information and belief, Defendants also failed to submit an annual report or

discharge monitoring report in 2019.

110.    On information and belief, Defendants did not collect a stormwater sample in the

first half of 2020 and did not submit a discharge monitoring report for the first half of the year.

**Excessively Polluted Stormwater is Discharged from the Facility**

111.    As a result of the above practices, stormwater containing excessive pollutants

discharges from the Facility into Flushing Creek.

112.    While Defendant has repeatedly failed to take stormwater samples and report on

them, in some of the years since 2012 Defendants have taken samples (or arranged for samples

to be taken) of storm water discharges from outfall 001 at the Facility.

113.    Prior to 2020, sample results were reported to the DEC on written discharge

monitoring reports and, in 2020, to the EPA and DEC jointly through EPA's electronic system

for submission of discharge monitoring reports online.  Defendants certified each of those reports

pursuant to the General Permit.

114.    In those years in which samples were taken, the DMRs consistently reported high

pollutant levels in the Facility's stormwater discharges.

115.    The levels of total suspended solids (TSS) in Defendants' permitted stormwater

discharges have consistently exceeded the benchmark value for TSS of 100 mg/L established by

the DEC.  In Defendants' 2012 DMR, the level of TSS measured from Outfall 001 at the Facility

was at least 388 mg/L, and in the 2015 DMR, the level of TSS measured was at least 478 mg/L. In 2020 (the only year since 2015 in which Defendants collected a sample) the level of TSS again exceeded the benchmark; it was measured at 162 mg/L.

116.    Defendants have also exceeded the benchmark value for pH of 6–9, as Defendants' 2015 DMR measured a pH of 9.12.

117.    In the 2015 DMR, Defendants measured 5.05 mg/L of iron, exceeding the benchmark of 1 mg/L.  In 2020 (the only year since 2015 in which Defendants collected a sample) the level of iron again exceeded the benchmark; it was measured at 2.7 mg/L.

118.    Defendants have also reported visual concerns in their quarterly monitoring reports.  In Q2 2014 and Q3 2015, Defendants reported foam in their collection pond, and in Q1 2017, Defendants reported that their discharge was milky in color.

119.    In light of these recurrent benchmark exceedances and visual concerns, Riverkeeper alleges that since at least 2012 Defendants have failed to implement BAT and BCT at the Facility for their discharges of TSS, iron, and other pollutants.

**Defendants Have Not Taken Corrective Actions To Address Pollution Problems**

120.    In their annual certification report ("ACR") for 2015, submitted on February 1, 2016, Defendants reported that they had exceeded several benchmarks, but did not describe taking corrective actions in response.  This is a violation of the General Permit.  General Permit, Part V.

121.    DEC issued an NOV for this violation and ordered Defendants to submit a corrective action report within 30 days of October 5, 2016.  Upon information and belief, Riverkeeper alleges that Defendants never submitted the ordered corrective action report.

122.    As set forth above, Defendants have recently exceeded benchmarks and

discharged visibly polluted waters into Flushing Creek.  Upon information and belief,

Riverkeeper alleges that Defendants have not taken corrective action or submitted corrective

action reports in relation to these recent, ongoing pollution episodes.

123.    Information available to Riverkeeper indicates that Defendants have not fulfilled

the requirements set forth in the General Permit for discharges from the Facility due to the

continued discharge of contaminated stormwater.  Riverkeeper is informed and believes, and

thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

124.    Further detailed facts, including additional detail on specific dates of incidents

and conditions that constitute violations of the General Permit, are set forth in the Notice Letter

that is attached to this Complaint as an exhibit and are incorporated by reference.

## VI.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges From the Pipe: Unlawful Discharge of Pollutants**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

125.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully

set forth herein.

126.    CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any

pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated

sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by

a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

127.    Defendants are only authorized to discharge stormwater through a single outfall.

128.    Defendants have discharged and continue to discharge stormwater associated with

industrial activity that contains pollutants from the Pipe, an unpermitted discharge location at the

Facility to waters of the United States without a NPDES permit.

129.    Every day on which Defendants discharges stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

130.    Defendants also have discharged and continue to discharge process wastewater that contains pollutants from the Pipe.

131.    Every day on which Defendants discharge process wastewater without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

**SECOND CAUSE OF ACTION**
**Discharges From Truck Washing and Track-Out: Unlawful Discharge of Pollutants**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

132.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

133.    CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

134.    By washing their concrete trucks with hoses and discharging the resulting process wastewater to municipal storm drains that flow to Flushing Creek, Defendants discharge and continue to discharge process wastewater that contains pollutants from unpermitted discharge locations at the Facility to waters of the United States without a NPDES permit.

135.    Every day on which Defendants discharge process wastewater without

authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

136.    By generating track-out pollution that is carried by stormwater into storm drains that flow into Flushing Creek, Defendants discharge and continue to discharge stormwater associated with industrial activity that contains pollutants from unpermitted discharge locations at the Facility to waters of the United States without a NPDES permit.

137.    Every day on which Defendants discharges stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

138.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

139.    The General Permit, Parts II.D and VII, requires Defendants to implement mandatory general and sector-specific control measures and BMPs in order to minimize the discharge of pollutants from the Facility.

140.    Under the General Permit, Part II, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures (including Best Management Practices (BMPs) selected and designed in accordance with Part II.D) that are technologically available and economically practicable and achievable in light of best industry practice."

141.    To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology

Economically Achievable ("BAT" or "BATEA") or Best Conventional Pollutant Control

Technology ("BCT"), depending upon the type of pollutant being discharged.  CWA

§ 301(b)(2)(A), (E), 33 U.S.C. § 1311(b)(2)(A), (E).

142.    Because the industrial activities carried out at the Facility are categorized in SIC

Code 3273, Defendants must implement the sector-specific control measures specified in Part

VII of the General Permit for Sector E.

143.    Riverkeeper is informed and believes, and thereupon alleges that, as of the filing

date of this complaint, Defendants have not implemented adequate control measures or BMPs

required by the General Permit.

144.    Defendants have failed to implement control measures that meet the BAT and

BCT standards at the Facility for its discharges of stormwater associated with industrial activity

containing chemical oxygen demand, TSS, iron, and other pollutants, in violation of Parts II and

VII of the General Permit.

145.    Each day that Defendants has failed to develop and implement BAT and BCT in

violation of the General Permit is a separate and distinct violation of the General Permit and

Section 301(a) of the Act, 33 U.S.C. § 1311(a).

146.    Defendants continue to be in violation of the BAT/BCT requirements each day

that they fail to develop and fully implement BAT/BCT at the Facility.

**FOURTH CAUSE OF ACTION**
**Failure to Develop, Implement, and Maintain an**
**Adequate Storm Water Pollution Prevention Plan**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

147.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully

set forth herein.

148.     Part III of the General Permit requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan.

149.     As described in Part III.A.3 of the General Permit, the SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

150.     Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

151.     The SWPPP must address, at a minimum: (1) each of the universally applicable elements set forth in Part III.A of the General Permit; (2) each of the applicable sector-specific plan elements specified in Part VIII of the General Permit, *see* Part III.A.7; and, (3) as applicable, additional special requirements listed in Part III.D of the General Permit for discharges through a municipal separate storm sewer or discharges to impaired waterbodies. Each of these elements also require the discharger to maintain records and documentation of compliance with each of these elements.

152.     The SWPPP must be representative of current site conditions and kept up to date. General Permit, Part III.E.

153.     Defendants have failed to develop, implement and keep up to date an adequate SWPPP for the Facility.  The inadequacy of the SWPPP is evidenced by, *inter alia*, the inadequate stormwater control measures and BMPs at the Facility and by the Facility's continuing discharges of excessively polluted storm water.

154.     Defendants has failed to update the SWPPP for the Facility in response to the analytical results of the facilities' stormwater monitoring.

155.     Each day that Defendants have failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

156.     Defendants continue to be in violation of the SWPPP requirements each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

**FIFTH CAUSE OF ACTION**
**Failure to Conduct Routine Site Inspections and Comply with**
**General Monitoring, Recordkeeping, and Reporting Requirements**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

157.     Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

158.     The General Permit requires facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.

159.     Defendants failed to document and report discharges from the Facility in 2016, 2017, 2018, 2019, and 2020.

160.     Upon information and belief, Riverkeeper alleges that Defendants  also failed to conduct the requisite quarterly monitoring of their Facility over the same time period.

161.     Defendants have also failed to conduct adequate annual and quarterly site inspections of the Facility.  The inadequacy of these inspections is evidenced by the inadequate stormwater control measures and BMPs identified above, and by the Facility's continuing discharges of excessively polluted storm water.

162.     Defendants have established an ongoing pattern of failing to inspect, monitor, keep records, and report on stormwater pollution, in violation of the General Permit.

163.   Each and every day on which Defendants fail to comply with any of the General Permit's inspection, monitoring, recordkeeping, and reporting requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous violations of the Act

**SIXTH CAUSE OF ACTION**
**Failure to Take Corrective Actions**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

164.   Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

165.   The General Permit requires industrial dischargers to take corrective action when (1) there is evidence indicating that a permittee's stormwater discharges cause, have reasonable potential to cause or contribute to violations of water quality standards; (2) when a site inspection indicates the presence of stormwater pollution through visual indicators such as color or floating solids in a discharge; (3) when a non-stormwater discharge is discovered; (4) or when a benchmark exceedance is detected in a stormwater sample.  Corrective actions to address these problems must be documented in the Facility's SWPPP.

166.   Defendants have consistently failed to take necessary corrective actions to address problems at the Facility.

167.   Defendants have exceeded and continue to exceed their benchmarks, but fail to take required corrective action.

168.   Defendants have discharged and continue to discharge process wastewater, but fail to take required corrective action.

169.   Defendants have discharged and continue to discharge visibly discolored water and floating substances from the Pipe, and these discharges cause violations of water quality

standards, but Defendants fail to take required corrective action.

170.    Each and every day on which Defendants fail to comply with the General

Permit's corrective action requirements is a separate and distinct violation of CWA Sections

301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous

violations of the Act.

## SEVENTH CAUSE OF ACTION
### Causing or Contributing to Violations of Water Quality Standards
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

171.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully

set forth herein.

172.    The General Permit prohibits any discharge that may cause or contribute to a

violation of New York's water quality standards.  The General Permit notes that any such

discharge is also a violation of New York's Environmental Conservation Law ("ECL").  General

Permit, Part II.C.1(a), (c).

173.    The water quality standards applicable to Flushing Creek prohibit all discharges

that "adversely affect the . . . color" of Flushing Creek, "cause a substantial visible contrast" to

its waters, or introduce "floating substances." 6 N.Y.C.R.R. § 703.2.

174.    Defendants' discharges through the Pipe adversely affect the color of Flushing

Creek, cause a substantial visible contrast to its waters, and discharge floating substances.

Therefore, Defendants' discharges through the Pipe cause violations of New York's water

quality standards.  6 N.Y.C.R.R. § 703.2.

175.    Defendants' discharges also contribute to the ongoing violation of the water

quality standard for dissolved oxygen in Flushing Creek.

176.    Oxygen-demanding pollutants are commonly discharged by ready-mix concrete plants.

177.    New York State has designated Flushing Creek as impaired by excessive oxygen demand, i.e., low dissolved oxygen in the water.  New York's water quality standards require that dissolved oxygen levels in Flushing Creek, a Class I waterbody, must exceed 4.0 mg/L at all times.  *Id.* § 703.3.  Flushing Creek does not attain even this level of dissolved oxygen.

178.    A waterbody impaired by low dissolved oxygen has, by definition, an inadequate stock of dissolved oxygen to support aquatic life.  Since it already lacks an adequate stock of oxygen, the waterbody lacks the capacity to absorb stormwater discharges with high chemical oxygen demand.

179.    Thus, when Defendants discharge stormwater with high levels of oxygen demanding pollutants into Flushing Creek, the discharge contributes to the ongoing violation of dissolved oxygen standards.

180.    Each and every day on which Defendants cause or contribute to a violation of water quality standards is a separate and distinct violation of the General Permit, Part II.C, and of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342.  These violations are ongoing and continuous.

## VII.

## PRAYER FOR RELIEF

181.    Wherefore, Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.    Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facility except as authorized by and in compliance with the General Permit;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendants to comply with the General Permit's inspection, monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendants to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.   Order Defendants to provide Riverkeeper with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.   Order Defendants to pay civil penalties of up to $37,500 per day per violation for all violations occurring on or before November 2, 2015, and $55,800 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.   Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.   Order Defendants to pay the costs of litigation, including Riverkeeper's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

k.   Award any such other and further relief as this Court may deem appropriate.

Exhibit A: Notice Letter

Dated this 22nd day of October, 2020          Respectfully submitted,
New York, New York

                                              By:  /s/ Julia Muench_____

                                              Edan Rotenberg
                                              Julia Muench

                                              SUPER LAW GROUP, LLC
                                              180 Maiden Lane, Suite 603
                                              New York, NY 10038
                                              *Attorneys for Riverkeeper*